STATE OF CONNECTICUT *v.* CESAR
SANTIAGO DELOSSANTOS
(13230)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued March 9—decision released May 23, 1989

*Michael K. Courtney,* deputy assistant public defender, for the appellant (defendant).

*Susan E. Gill,* assistant state's attorney, with whom, on the brief, were *Walter Flanagan,* state's attorney, and *Robert C. Brunetti* and *Carolyn Longstreth,* assistant state's attorneys, for the appellee (state).

GLASS, J. The principal issue in this case is whether, under *New York* v. *Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981), the hatchback area of an automobile is part of the "passenger compartment" and, therefore, within the scope of a search incident to the arrest of the operator. In an amended information, the state charged the defendant, Cesar Santiago Delossantos, with the crimes of unlawful possession and transportation of cocaine with intent to sell, in violation of General Statutes (Rev. to 1987) § 21a-278 (a),[1] and possession of a weapon in a motor vehicle without a permit, in violation of General Statutes (Rev. to 1987) § 29-38.[2] After a jury verdict of guilty on both counts,

[1] "[General Statutes (Rev. to 1987)] Sec. 21a-278. (Formerly Sec. 19-480a). PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION OR ADMINISTRATION BY NON-DRUG-DEPENDENT PERSON. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[2] "[General Statutes (Rev. to 1987)] Sec. 29-38. WEAPONS IN VEHICLES. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon,' as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the han-

the trial court sentenced the defendant to a total effective sentence of twenty-three years imprisonment, execution suspended after fifteen years, and five years probation. The defendant appealed to this court from the judgment of conviction. We find no error.

The jury could reasonably have found the following facts. On the night of December 26, 1986, Connecticut state police trooper Robert Kenney was conducting a radar check for speeders on the eastbound lanes of interstate route 84 in Danbury. At approximately 10:10 p.m., Kenney detected on his radar that a two door 1980 Plymouth Horizon hatchback model automobile was traveling at the rate of sixty-eight miles per hour, thirteen miles per hour over the posted speed limit. At Kenney's signal, the defendant, who was the lone occupant of the automobile, pulled over. Upon Kenney's request, the defendant produced his operator's license and an automobile registration. The automobile was registered to Percio Urena, who lived in the same apartment building as the defendant in Danbury. Urena had loaned the automobile to the defendant two days before.

Standing at the side of the automobile, Kenney looked through the left corner of the windshield. The light of his flashlight fell on what appeared to be the wooden butt of a pistol beneath the driver's seat. Kenney ordered the defendant out of the automobile, escorted him to the front and frisked him. Kenney then entered

dle, having a blade of over one and one-half inches in length, and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles, stiletto, any knife, the edged portion of the blade of which is four inches or over in length or any martial arts weapon as defined in section 53a-3. The provisions of this section shall not apply to any person enrolled in and currently attending a martial arts school, with official verification of such enrollment and attendance, having any martial arts weapon including, but not limited to, nunchaku and Chinese stars in a vehicle while traveling to and from such school."

the automobile from the passenger door. He reached beneath the driver's seat and removed a fully loaded .357 magnum revolver. Kenney returned to the defendant and asked if he owned the pistol and whether he had a permit. The defendant admitted that he owned the pistol and had no permit. Kenney then placed him under arrest and handcuffed and searched him. At that moment Kenney's partner, trooper Gerald Pennington, arrived on the scene. Pennington watched the defendant while Kenney searched the automobile. The search of the front and back seats uncovered nothing. Kenney then reached into the hatchback area, lifted a black imitation leather cover, and discovered a brown paper bag. Inside the brown paper bag was a clear plastic bag containing a hard packed white powder substance. Subsequent laboratory analysis revealed that the white powder substance weighed approximately 17.3 ounces and contained 64.2 percent pure cocaine. The defendant testified at trial that he did not know the cocaine was in the automobile.

On appeal, the defendant claims that the trial court erred: (1) in denying his motion to suppress evidence of the cocaine; (2) in excluding a defense witness' testimony that Urena, the owner of the automobile, was a cocaine dealer; (3) in denying his motions for judgment of acquittal of the § 29-38 count on the ground of insufficient evidence of the revolver's "operability," and in failing to instruct the jury that "operability" is an element of the crime; (4) in instructing the jury on "constructive possession" and "aggregate weight" of the seized narcotics; (5) in denying his motion for judgment of acquittal based on the ground of insufficient evidence that he violated § 21a-278 (a); (6) in denying his pretrial motion to dismiss based on a claim that the trial court had no authority to sentence him under § 21a-278 (a); and (7) in denying his motion for a new

trial based on a claim of statewide selective enforcement of § 21a-278 (a). We find no error.

I

Prior to trial, the defendant moved to suppress evidence of the cocaine, claiming that Kenney's search of the hatchback area of the automobile was illegal. After a pretrial hearing, the trial court denied the defendant's motion, ruling that the search was valid as a search incident to a lawful arrest. On appeal, the defendant argues that the warrantless search of the hatchback area exceeded the permissible scope of a search incident to arrest, in violation of his rights under the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. He claims, therefore, that the trial court erred in failing to suppress the evidence seized in the hatchback search. We disagree.

In *New York* v. *Belton*, supra, 460–61, the United States Supreme Court held that "when a [police officer] has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile. . . . [P]olice may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach. *United States* v. *Robinson*, [414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)]; *Draper* v. *United States*, 358 U.S. 307, 79 S. Ct. 329, 3 L. Ed. 2d 327 [1959]. Such a container may, of course, be searched whether it is open or closed, since . . . the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." The *Belton* rule "encompasses only the interior of the passenger compartment of an automobile and does not encompass the trunk." Id., 460 n.4.

In *United States* v. *Russell,* 670 F.2d 323, 327 (D.C. Cir.), cert. denied, 457 U.S. 1108, 102 S. Ct. 2909, 73 L. Ed. 2d 1317 (1982), the Court of Appeals for the District of Columbia held that, under *Belton,* the hatchback area of an automobile is part of the "passenger compartment," and therefore may be searched as a contemporaneous incident to the lawful custodial arrest of an occupant. In *Russell,* the police had probable cause to believe that there were drugs in the defendant's automobile. Id., 324. The police stopped the automobile and conducted a warrantless search while holding the defendant and three passengers in custody at the scene. The search uncovered a bag containing a handgun underneath the front seat and a large grocery type bag, covered by clothing, in the hatchback area. The second bag contained heroin. Id.

Addressing the argument that the search of the hatchback area was unconstitutional, the court stated that "[t]he question at issue . . . is whether the *Belton* rule encompasses hatchbacks. See [*New York* v. *Belton,* supra] at 2869 (Brennan, J., dissenting). This question has already attracted scholarly comment. See Y. Kamisar, [*The 'Automobile Search' Cases: The Court Does Little to Clarify the 'Labyrinth' of Judicial Uncertainty,* in J. Choper, Y. Kamisar & L. Tribe, The Supreme Court: Trends and Developments 1980-1981], at 94-95; 30 Crim. L. Rep. (BNA) 2065, 2066 (Oct. 21, 1981) (summarizing remarks of Prof. Yale Kamisar); Kamisar, *Fourth Amendment Hatchback,* Washington Post, Oct. 15, 1981, at A29. We note particularly the comment of an authority the Court cited in *Belton,* Professor Wayne R. LaFave, author of *Search and Seizure: A Treatise on the Fourth Amendment. Belton,* Professor LaFave observes, 'rejects a case-by-case [approach] in favor of a standardized procedure' that police officers may follow routinely. 2 W. LaFave, supra, § 7.1, at 132 & n.9.2 (Supp. 1982). In keeping

with the *Belton* majority's intent 'to avoid case-by-case evaluations of control,' id. at 136, LaFave suggests that 'passenger compartment,' for purposes of the *Belton* rule, is properly read 'as including *all* space reachable without exiting the vehicle.' Id. (distinguishing, however, areas that would require 'some dismantling of the vehicle,' for example, door panel interiors, and other places to which there is 'virtually *no* chance the arrestee could have acquired access') (emphasis in original)." *United States* v. *Russell,* supra, 326. The court concluded that "in light of the emphasis the Supreme Court placed in *Belton* on a workable definition of the area of a car subject to warrantless search in conjunction with a lawful custodial arrest . . . a hatchback reachable without exiting the vehicle properly ranks as part of the interior or passenger compartment." Id., 327.

In the present case, the trial court found that it was unnecessary to open the hatchback of Urena's automobile from the exterior to gain access, and that "the hatchback really amounts to an extension of the passenger compartment of the car. At least it's an area that's readily accessible from the interior of the car." See *United States* v. *Russell,* supra (hatchback within control of car occupants from interior). The defendant does not challenge the trial court's factual conclusions respecting the interior accessibility of the hatchback. That the hatchback area could not be reached by someone sitting in the front seat is immaterial under *Belton* and *Russell.* Constitutional rights are not dependent upon a person's size. We conclude, therefore, that the warrantless search of the hatchback area in this case was permissible as a search incident to the defendant's arrest. *New York* v. *Belton,* supra; *Chimel* v. *California,* 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); *United States* v. *Russell,* supra.

The defendant urges us to hold that even if the hatchback search is permissible as a search incident to arrest

under the federal constitution, it should not be permissible under article first, § 7, of the Connecticut constitution.[3] It is beyond debate that each state has the " 'sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.' *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); see *Oregon* v. *Hass,* 420 U.S. 714, 718, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975)." *State* v. *Dukes,* 209 Conn. 98, 104, 547 A.2d 10 (1988). In considering the level of individual protection and the scope of a warrantless search of an automobile under article first, § 7, of the Connecticut constitution, we have observed that "our automobile exception permits a warrantless search of an automobile whenever the police have probable cause to do so. See, e.g., *State* v. *Badgett,* 200 Conn. 412, 428, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 473, 93 L. Ed. 2d 373 (1986). It is also correct that we have recognized that the police may make a search without a warrant incidental to a lawful custodial arrest. Id., 424; see *New York* v. *Belton,* supra; *State* v. *Shaw,* 186 Conn. 45, 48, 438 A.2d 872 (1982)." *State* v. *Dukes,* supra, 120–21.

We have thus recognized that state constitutional standards enable police to make a warrantless search incident to a lawful custodial arrest. The defendant concedes that his arrest was lawful, and he has not presented any authority to support his assertion that a search incident to a lawful custodial arrest under Connecticut constitutional standards should be delimited in the manner he suggests. We hold that when police make a lawful custodial arrest of an occupant of an

[3] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

automobile, and the arrestee is detained at the scene, police may contemporaneously search without a warrant the interior passenger compartment of the automobile. *State* v. *Dukes,* supra; *State* v. *Shaw,* supra. The passenger compartment encompasses all " 'space reachable without exiting the vehicle.' " *United States* v. *Russell,* supra, 326. In the present case, because the hatchback was an extension of the passenger compartment, the warrantless search contemporaneous to the defendant's arrest was proper under Connecticut state constitutional standards. Accordingly, the trial court did not err in denying the defendant's motion to suppress evidence of the cocaine seized during the warrantless search of the hatchback area of Urena's automobile.[4]

## II

The defendant next claims that the trial court abused its discretion by barring a defense witness' testimony that Urena, the owner of the automobile the defendant had been operating when arrested, was a cocaine dealer. Although the defendant has not abandoned this claim, he conceded at oral argument that he was no longer "seriously pursuing" it, and that the trial court's exclusion of the offered testimony may "very well" have been within its discretion.

Urena testified for the state that he lived in the same apartment building as the defendant on Wooster Street in Danbury, and that he had known him for several months. According to Urena, the defendant borrowed Urena's automobile on December 24, 1986, to drive to

---

[4] The trial court also ruled that trooper Kenney had probable cause to search the hatchback area of the vehicle after he had discovered the handgun beneath the front seat. The defendant argues that this finding is erroneous. Because we conclude that the search was a valid search incident to the defendant's custodial arrest, we do not address the probable cause issue.

New York to see his family. Urena testified that he had
no knowledge of the cocaine or of the handgun discov-
ered in the automobile. He also testified that he had
no criminal record and that he worked at a local store.
On cross-examination, Urena denied that he had ever
used or sold cocaine, and denied that he was involved
in a large scale narcotics operation. He admitted, how-
ever, that in October, 1986, another car he had owned
had been seized in a drug arrest. He also admitted that
in December, 1985, police arrested him on drug related
charges when they executed a search warrant at his
residence on Spring Street in Danbury. The target of
the search was Jose Nunez. The charges against Urena
stemming from the Spring Street arrest were later
dropped.

Dinioio Jimenez, testifying for the defendant, stated
that he was acquainted with Percio Urena.[5] When
defense counsel asked whether Jimenez knew what
Urena did for a living, the state objected on the grounds
that the question was irrelevant and immaterial. The
trial court excused the jury to permit the defendant
to make an offer of proof. During the offer, Jimenez
stated that he had known Urena for two years, that
he knew that Urena was a drug dealer, and that
"[e]verybody knows in town, even the police," that
Urena was a drug dealer. He testified that in Novem-
ber, 1986, he was visiting the defendant in his apart-
ment when Jose Nunez came by, looking for Urena.
When Urena arrived, Nunez told Urena that he
"needed the stuff." Nunez and Urena then exited the
apartment onto the stairs. Jimenez did not observe
them after they had left the apartment. Jimenez also
testified that on December 20, 1986, an individual
named Jose Pena attempted to sell him a television set.
According to Jimenez, Pena told him he needed the

---

[5] Defense counsel informed us at oral argument that Jimenez has since
died.

money to pay Urena for a drug transaction. In response to the trial court's question, Jimenez testified that he had never had any drug dealings with Urena.

The trial court sustained the state's objection, ruling that Jimenez' testimony was inadmissible because "[y]ou cannot impeach a witness by contradicting his testimony as to collateral matters. . . . " The court also rejected the defendant's argument that the testimony was admissible as evidence of another's guilt, stating that "if you had a direct witness that could show the involvement of Mr. Urena specifically in this transaction, that's a whole entirely different matter but this man isn't testifying to that." The defendant then informed the court that he intended to subpoena the Danbury police department for any records or notes relating to drug investigations of Urena.

Subsequently, on August 5, 1987, the trial court permitted the defendant to mark four documents for identification for appellate review. Of particular significance, the defendant's exhibit 16 is a Danbury police department incident report relating to the execution of the search warrant at Urena's residence in December of 1985. The reporting officer disclosed that upon entering the apartment, the police discovered Urena in the bathroom where the toilet was flushing. Urena had in his possession over $4000 in cash, and police found several items of drug paraphernalia and two guns in the apartment. In that incident, Jose Nunez was arrested along with Urena. In addition, exhibit 13 indicates that it was Nunez who, in October, 1986, had been arrested while operating an automobile registered to Urena and, as a result of the arrest, convicted on narcotics charges.

The defendant claims that the trial court's exclusion of Jimenez' testimony violated his federal and state constitutional rights to present witnesses on his own behalf. He argues that the proffered testimony,

together with the evidence that Urena owned the automobile in which police discovered the cocaine, sufficiently connected Urena to the crime. He also argues that Jimenez' testimony was admissible to impeach Urena's assertions that he had no involvement in drug activity. We disagree.

We have considered on several occasions the admissibility of evidence offered to inculpate a person other than the accused in the commission of the crime. See, e.g., *State* v. *Milner,* 206 Conn. 512, 517, 539 A.2d 80 (1988); *State* v. *Echols,* 203 Conn. 385, 392–93, 524 A.2d 1143 (1987); *State* v. *Burge,* 195 Conn. 232, 252, 487 A.2d 532 (1985); *Siemon* v. *Stoughton,* 184 Conn. 547, 555, 440 A.2d 210 (1981); *State* v. *Giguere,* 184 Conn. 400, 405, 439 A.2d 1040 (1981); *State* v. *Gold,* 180 Conn. 619, 645–46, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Kinsey,* 173 Conn. 344, 347–48, 377 A.2d 1095 (1977). " 'Ordinarily, evidence concerning a third party's involvement is not admissible until there is some evidence which *directly connects* that third party with the crime.' (Emphasis added.) *State* v. *Kinsey,* [supra, 348]. 'The defendant can always show that some other person and not the defendant committed the crime; however, it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person.' " *State* v. *Giguere,* supra, 405; see also *State* v. *John,* 210 Conn. 652, 670, 557 A.2d 93 (1989). Generally, the evidence must demonstrate that guilt in the other is inconsistent with guilt in the accused. *State* v. *Zaccagnini,* 308 S.E.2d 131, 136 (W. Va. 1983).

The rules of relevancy govern the admissibility of third party inculpatory evidence. Evidence is relevant if " ' "it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . 'One fact is relevant to another fact whenever, according

to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. . . .' " ' (Citations omitted.) [*State* v. *Echols,* supra, 393.] A trial court's ruling on the relevancy of such evidence will be reversed only if the court has abused its discretion or an injustice appears to have been done. Id." *State* v. *Milner,* supra, 517–18.

In the present case, the defendant concedes that he could produce no direct evidence of Urena's involvement in the crime. Cf. *State* v. *Kinsey,* supra, 347–48 (evidence that a third person engaged in drug activity inadmissible where defendant was unable to demonstrate that the third person was in state or selling narcotics at the time of the offense); *State* v. *Aspinall,* 6 Conn. App. 546, 552, 506 A.2d 1063 (1986) (trial court did not abuse discretion in excluding evidence that third person with same first name as defendant was cocaine dealer); see also *United States* v. *Stewart,* 770 F.2d 825, 829–30 (9th Cir. 1985), cert. denied, 474 U.S. 1103, 106 S. Ct. 888, 88 L. Ed. 2d 922 (1986) (evidence of drug paraphernalia in codefendant's house inadmissible); cf. *Wesenberg* v. *State,* 504 So. 2d 328, 334 (Ala. Crim. App. 1986) (because possession of narcotics may be joint, court properly excluded testimony regarding others' ownership of controlled substances found in search); but see *United States* v. *Morgan,* 581 F.2d 933, 936 (D.C. Cir. 1978) (where defendant arrested in house and search of basement uncovered narcotics, trial court erred in excluding evidence that son of woman who owned house dealt in drugs). Moreover, the defendant's possession of the automobile for the two days immediately preceding his arrest attenuated Urena's connection to the automobile. Thus, this is not a case in which police discovered the contraband in an automobile the operator borrowed minutes prior to the arrest. Cf. *State* v. *Vigee,* 518 So. 2d 501, 503–504 (La. 1988) (where

defendant stopped approximately twenty minutes after he borrowed automobile, error to exclude evidence that recent owner was known drug dealer).

Further, Jimenez' testimony regarding Urena's involvement with narcotics was not inconsistent with the defendant's guilt. *State* v. *Zaccagnini,* supra. Although this evidence, if credited by the jury, may have established that Urena was a cocaine trafficker, that fact would not have been inconsistent with the defendant's responsibility for possessing and transporting cocaine with intent to sell. Because the defendant offered no evidence directly connecting Urena to the specific crime, the proffered testimony was not relevant to any fact in issue. *State* v. *Milner,* supra, 518; *State* v. *Echols,* supra. Finally, since Jimenez' testimony was immaterial, Urena's denial of narcotics activity on cross-examination was not subject to contradiction by extrinsic evidence. *State* v. *Burns,* 173 Conn. 317, 327–28, 377 A.2d 1082 (1977) (testimony on collateral matter cannot be contradicted by other evidence).

## III

The defendant next claims that the trial court erred in denying his motions for judgment of acquittal on the weapon count, General Statutes (Rev. to 1987) § 29-38, since the state offered no proof that the revolver was operable. He also claims that the trial court erred in failing to instruct the jury that the state had to prove operability as an element of the crime. We are unpersuaded.

General Statutes (Rev. to 1987) § 29-38 provides in relevant part that "[a]ny person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202 . . . shall be fined not more than one thou-

sand dollars or imprisoned not more than five years or both . . . . The word 'weapon', as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release . . . and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles, stiletto, any knife . . . or any martial arts weapon as defined in section 53a-3. . . ." Thus, in a prosecution for a violation of § 29-38, the state must prove the following elements: (1) that the defendant owned, operated or occupied the vehicle; (2) that he had a weapon in the vehicle; (3) that he knew the weapon was in the vehicle; and (4) that he had no permit or registration for the weapon. Nothing in § 29-38 remotely suggests that operability of the weapon is an element of the offense.

The defendant nevertheless argues that because "revolver" as used in § 29-38 is defined in § 29-27[6] as "any firearm having a barrel less than twelve inches in length," and because § 53a-3 (19)[7] defines "firearm" as "any . . . revolver or other weapon, whether loaded or unloaded from which a shot may be discharged," the state had to prove that the revolver seized in the automobile was capable of discharging a shot. We disagree with the defendant's assumption that the definition of "firearm" found in the penal code applies to prosecutions under § 29-38. Sections 29-27 and 29-38 were enacted in substantially their present forms in 1949. General Statutes (1949 Rev.) §§ 4157, 4169. The penal code, however, was enacted in 1969.

---

[6] General Statutes § 29-27 provides: " 'PISTOL' AND 'REVOLVER' DEFINED. The term 'pistol' and the term 'revolver,' as used in sections 29-28 to 29-38, inclusive, mean any firearm having a barrel less than twelve inches in length."

[7] General Statutes § 53a-3 (19) provides: " 'Firearm' means any sawed-off shotgun, machine gun, rifle, shotgun, pistol, revolver or other weapon, whether loaded or unloaded from which a shot may be discharged."

Public Acts 1969, No. 828. Because the offense proscribed in § 29-38 antedated the penal code by twenty years, it is obvious that the legislature did not intend the definition of "revolver" in § 29-27 to be augmented by a definition of "firearm" that did not exist. Moreover, neither the substantive section, § 29-38, nor the applicable definitional section, § 29-27, expressly look to § 53a-3 to augment the definition of "revolver" found in § 29-27.

Further, § 53a-3 (18) defines "pistol" or "revolver" as "any firearm having a barrel less than twelve inches." This language is identical to that in § 29-27, the section expressly defining "revolver" as used in § 29-38. If the definition of "revolver" applicable to § 29-38 were subject to penal code definitions, § 29-27 would be superfluous, since § 53a-3 (18) provides the same definition. Such an interpretation undercuts the established principle that " 'no part of a legislative enactment is to be treated as insignificant or unnecessary, and there is a presumption of purpose behind every sentence, clause or phrase . . . . ' " *DeFonce Construction Corporation* v. *State,* 198 Conn. 185, 187, 501 A.2d 745 (1985). We also note that § 29-38 includes in its list of prohibited weapons "any martial arts weapon as defined by section 53a-3." The legislature added this provision in 1986; Public Acts 1986, No. 86-280; thus, there can be no question that the reference to § 53a-3 solely pertains to "martial arts weapon." Cf. *Horak* v. *Middlesex Mutual Assurance Co.,* 181 Conn. 614, 616–17, 436 A.2d 783 (1980) (use of term "or" connotes separability). Section 29-38 does not, however, refer to § 53a-3 for a definition of any other weapon. Because § 29-38 specifically refers to § 53a-3 to define only one of the several "weapons" listed, we conclude that the legislature did not intend the definition of "firearm" in § 53a-3 (19) to apply to the term "revolver" in § 29-38.

We acknowledge that § 53a-2[8] states that the provisions of the penal code "shall apply to any offense defined in this title or the general statutes, unless otherwise expressly provided or unless the context otherwise requires . . . ." For the reasons discussed above, however, we are persuaded that the "context" of §§ 29-27 and 29-38 implicitly renders the penal code definition of "firearm" inapplicable to a prosecution for violating § 29-38. See *State* v. *Hill,* 201 Conn. 505, 515 n.7, 523 A.2d 1252 (1986) ("[b]ecause § 53a-3 *expressly provides* that the definitions contained therein 'have the following meaning when *used in this title*' [emphasis added] it appears the legislature intended to restrict the scope of this provision to Title 53a only"). Finally, the defendant's reliance on *State* v. *Zayas,* 3 Conn. App. 289, 489 A.2d 380, cert. denied, 195 Conn. 803, 491 A.2d 1104 (1985), is unavailing. In *Zayas,* the defendant, tried and convicted for violating § 29-35,[9]

---

[8] "[General Statutes] Sec. 53a-2. APPLICATION AND SCOPE. The provisions of this title shall apply to any offense defined in this title or the general statutes, unless otherwise expressly provided or unless the context otherwise requires, and committed on or after October 1, 1971, and to any defense to prosecution for such an offense."

[9] "[General Statutes (Rev. to 1981)] Sec. 29-35. CARRYING OF PISTOL OR REVOLVER WITHOUT PERMIT RESTRICTED. No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this section shall not apply to the carrying of any pistol or revolver by any marshal, sheriff, parole officer or peace officer, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly; or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to

argued that the term "firearm" in § 29-27 is subject to the further definition of § 53a-3 (19), thus requiring the state to prove that the "firearm" was capable of discharging a shot. The Appellate Court ruled that the trial court did nor err in denying the defendant's motion for judgment of acquittal since "[t]he jury could reasonably have concluded that the gun was operable . . . . " Id., 299. In reaching this conclusion, the Appellate Court offered no analysis of the defendant's premise. In light of this omission, we do not find *Zayas* persuasive. Because "operability" of the "weapon" is not an essential element of § 29-38, the trial court did not err in denying the defendant's motions for judgment of acquittal or in failing to instruct the jury that "operability" is an element of the crime.

## IV

The defendant next claims: (A) that the trial court erred in its jury instructions on "constructive possession" and "aggregate weight" of the seized narcotics; and (B) that the evidence was insufficient to support his conviction for violating General Statutes (Rev. to 1987) § 21a-278 (a). We are not persuaded.

## A

The defendant argues that the trial court's instructions permitted the jury to infer his knowing and intentional possession of the cocaine from the fact that he was alone in the automobile when arrested, therefore depriving him of his constitutional right to be acquitted unless the state proves each element of the offense charged beyond a reasonable doubt. A review of the

his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States."

record reveals that the trial court's instructions were a correct statement of the law, and fairly presented the case to the jury. *State* v. *Harrell,* 199 Conn. 255, 271, 506 A.2d 1041 (1986).

"In order to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. See *State* v. *Williams,* 169 Conn. 322, 335, 363 A.2d 72 (1975); *State* v. *Harris,* 159 Conn. 521, 531–32, 271 A.2d 74 (1970), cert. dismissed, 400 U.S. 1019, 91 S. Ct. 578, 27 L. Ed. 2d 630 (1971). Where the defendant is not in exclusive possession of the premises where the narcotics are found, 'it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference.' *Evans* v. *United States,* 257 F.2d 121, 128 (9th Cir.), cert. denied, 358 U.S. 866, 79 S. Ct. 98, 3 L. Ed. 2d 99, reh. denied, 358 U.S. 901, 79 S. Ct. 221, 3 L. Ed. 2d 150 (1958); see generally annot., 56 A.L.R.3d 948 (1974)." *State* v. *Alfonso,* 195 Conn. 624, 633, 490 A.2d 75 (1985).

In language drawn directly from *State* v. *Alfonso,* supra, the trial court instructed the jury that "[i]f the defendant was not in exclusive possession of the car where the narcotics were found at the time he was apprehended, it may not be inferred that the defendant knew of the presence of the narcotics and had control over them unless there are other incriminating statements, evidence or circumstances tending to buttress such an inference." This instruction was correct in that it permitted the jury to infer the defendant's possession of the cocaine from his exclusive possession of the automobile. "[O]ne who owns or exercises dominion or control over a motor vehicle in which a contraband substance is concealed may be deemed to possess

the contraband." *United States* v. *Richardson,* 848 F.2d 509, 512 (5th Cir. 1988); *United States* v. *Crockett,* 813 F.2d 1310, 1316 (5th Cir.), cert. denied, 484 U.S. 834, 108 S. Ct. 112, 98 L. Ed. 2d 71 (1987); *United States* v. *Williams-Hendricks,* 805 F.2d 496, 500 (5th Cir. 1986); *United States* v. *Damsky,* 740 F.2d 134, 139 (2d Cir.), cert. denied, 469 U.S. 918, 105 S. Ct. 298, 83 L. Ed. 2d 233 (1984); *United States* v. *Clark,* 732 F.2d 1536, 1540 (11th Cir. 1984); *United States* v. *Brunty,* 701 F.2d 1375, 1382 (11th Cir.), cert. denied, 464 U.S. 848, 104 S. Ct. 155, 78 L. Ed. 2d 143 (1983); *United States* v. *Vergara,* 687 F.2d 57, 62 (5th Cir. 1982). This principle does not conflict with our holding in *State* v. *Watson,* 165 Conn. 577, 596, 345 A.2d 532 (1973), that "[i]t cannot be logically and reasonably presumed that an occupant of a motor vehicle knew of the presence of an unregistered weapon in a vehicle simply on the fact that he was an occupant. Presence alone, 'unilluminated by other facts' is insufficient proof of possession." In *Watson,* the defendant and four others occupied the automobile at the time of apprehension. Id., 581. Thus, the defendant in *Watson* did not have exclusive possession of the vehicle when police discovered the contraband. Cf. *State* v. *Alfonso,* supra.

The defendant also claims that the trial court erred in instructing the jury that "another element for violation of Section 21a-278 (a) is that the state must prove beyond a reasonable doubt that the preparation, compound, mixture or substance contains either an aggregate weight of one ounce or more of cocaine. The term aggregate weight means the entire weight of the preparation, compound, mixture or substance which is alleged to contain the cocaine. The illegal substance will frequently be less than ten percent pure cocaine. The balance being sugar, milk, quinine, menite or the like. In other words, you must consider the weight of the

entire substance including the alleged illegal drug in combination with any other substance it may contain to be one ounce or more."

The relevant part of General Statutes (Rev. to 1987) § 21a-278 (a) provides that an offense is committed by "[a]ny person who . . . transports with the intent to sell or dispense . . . one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of . . . cocaine . . . ." The defendant argues that this language means that the state must prove that the substance seized contains at least one ounce of pure cocaine. Consequently, he claims, the trial court erred by permitting the jury to convict him if it found that the substance in the defendant's possession weighed at least one ounce and contained any amount of cocaine. The state, on the other hand, argues that the term "aggregate weight" means that the substance containing the cocaine must weigh one ounce. It asserts that § 21a-278 (a) expresses the legislature's intent to address the problem of narcotics distribution as it occurs "on the street," where diluted substances routinely pass from dealer to user.

We need not address these arguments since the evidence presented by the state, and not challenged by the defendant, demonstrated conclusively that the substance seized from the automobile contained well over one ounce of "pure" cocaine. The state's toxicologist testified that the substance weighed 17.3 ounces, and contained 64.2 percent cocaine by weight. Simple arithmetic establishes that pure cocaine composed 11.1066 ounces of the substance, exceeding the threshhold amount by more than 10 ounces. Although the defendant argues that the jury could have rejected the toxicologist's testimony pertaining to the concentration of cocaine, he conceded at oral argument that he made no attempt to impeach this testimony regarding either

the weight of the substance or the percentage of pure cocaine. Under these circumstances, therefore, the trial court's instructions could not have deprived the defendant of a fair trial. Cf. *State* v. *Cohane,* 193 Conn. 474, 485, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *State* v. *Nardini,* 187 Conn. 513, 531, 447 A.2d 396 (1982); *State* v. *Kurvin,* 186 Conn. 555, 567–69, 442 A.2d 1327 (1982); *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980).

B

The defendant next claims that the evidence was insufficient to sustain his conviction for violating General Statutes (Rev. to 1987) § 21a-278 (a). We disagree. "It is axiomatic that in reviewing a claim of insufficiency of the evidence, this court construes the evidence in the light most favorable to sustaining the jury's verdict and will affirm that verdict if it is reasonably supported by the evidence and the logical inferences drawn therefrom." *State* v. *Walker,* 206 Conn. 300, 315, 537 A.2d 1021 (1988). " ' " '[T]he issue is whether . . . the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt. ' . . . " ' " (Citations omitted.) *State* v. *Suggs,* 209 Conn. 733, 758, 553 A.2d 1110 (1989).

As we have indicated, the jury could have inferred the defendant's possession of the cocaine from his exclusive possession of the automobile. *United States* v. *Richardson,* supra. The defendant had been in possession of the automobile for two days when the police apprehended him on his drive from New York to Connecticut on interstate route 84. Urena testifed that he had not been responsible for placing the cocaine in the automobile. Moreover, if the jury found that the defendant had not been in exclusive possession of the car, there were other circumstances to support the conclusion that the defendant knowingly possessed the

cocaine. *State* v. *Alfonso,* supra. When detained by Kenney, the defendant admitted that he owned the loaded magnum revolver found under the front seat. The state presented expert testimony that individuals possessing large amounts of drugs often carry weapons to protect their goods. See *United States* v. *Rivera,* 844 F.2d 916, 926 (2d Cir. 1988) (weapons are tools of narcotics trade); *United States* v. *Crespo,* 834 F.2d 267, 271 (2d Cir. 1987), cert. denied, U.S. , 108 S. Ct. 1471, 99 L. Ed. 2d 700 (1988) (courts take judicial notice that for narcotics traffickers, possession of firearms is as common as possession of drug paraphernalia); *State* v. *Avila,* 166 Conn. 569, 580, 353 A.2d 776 (1974) (gun found with narcotics relevant to issue of intent to sell). In addition, the defendant testified that, while in New York, thieves broke through the windshield of the automobile and stole a jacket from the front seat. The jury could have inferred from this evidence that the cocaine was not in the automobile prior to the break in.

Finally, the jury could reasonably have found that the defendant knew of the narcotic character of the substance. "It is by now common knowledge that cocaine is often packaged as a white powder in small plastic bags." *State* v. *Parent,* 8 Conn. App. 469, 473, 513 A.2d 725 (1986). With respect to the remaining elements of § 21a-278 (a), the state's toxicologist testified that the amount of cocaine exceeded one ounce. The defendant did not challenge this testimony. Evidence that the seized substance weighed 17.3 ounces of 64.2 percent pure cocaine supported the inference that the defendant possessed the cocaine with intent to sell. See, e.g., *State* v. *Vilalastra,* 207 Conn. 35, 38–39, 540 A.2d 42 (1988); *State* v. *Williams,* 169 Conn. 322, 334, 363 A.2d 72 (1975); *State* v. *Clemons,* 168 Conn. 395, 407, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975); *State* v. *Avila,* supra. We conclude, therefore, that the evidence was sufficient to support

the defendant's conviction for violating § 21a-278 (a). *State* v. *Thompson,* 197 Conn. 67, 74, 495 A.2d 1054 (1985).

## V

The defendant next claims that the trial court erred in denying that portion of his pretrial supplemental motion to dismiss relating to the indeterminate sentencing provisions of General Statutes (Rev. to 1987) § 21a-278 (a). According to the defendant, § 21a-278 (a) calls for "indeterminate sentencing" in that it provides for imprisonment for "a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment." Under General Statutes § 53a-35a,[10] however, "[f]or any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence. . . . " The defendant argues that because § 53a-35a implicitly repealed the sentencing provisions of § 21a-278 (a), the

[10] "[General Statutes] Sec. 53a-35a. IMPRISONMENT FOR ANY FELONY COMMITTED ON OR AFTER JULY 1, 1981: DEFINITE SENTENCES; TERMS AUTHORIZED. For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed in accordance with section 53a-46a; (2) for the class A felony of murder, a term not less than twenty-five years nor more than life; (3) for a class A felony other than murder, a term not less than ten years nor more than twenty-five years; (4) for a class B felony, a term not less than one year nor more than twenty years, except that for a conviction under section 53a-55a, 53a-59 (a) (1), 53a-59a, 53a-70a, 53a-94a, 53a-101 (a) (1) or 53a-134 (a) (2), the term shall be not less than five years nor more than twenty years; (5) for a class C felony, a term not less than one year nor more than ten years, except that for a conviction under section 53a-56a, the term shall be not less than three years nor more than ten years; (6) for a class D felony, a term not less than one year nor more than five years, except that for a conviction under section 53a-60b, the term shall be not less than two years nor more than five years, and for a conviction under section 53a-60c, the term shall be not less than three years nor more than five years; (7) for an unclassified felony, a term in accordance with the sentence specified in the section of the general statutes that defines the crime."

trial court was without authority to sentence him for a conviction under § 21a-278 (a). We are not persuaded.

" ' "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." ' *State* v. *Roque,* 190 Conn. 143, 151, 460 A.2d 26 (1983), citing *Stoni* v. *Wasicki,* 179 Conn. 372, 376-77, 426 A.2d 774 (1979)." *In re Luis R.,* 204 Conn. 630, 635, 528 A.2d 1146 (1987). "Moreover, it is presumed that the legislature, in enacting a statute, acts with the knowledge of existing relative statutes and with the intention of creating one consistent body of law. . . . *State* v. *West,* 192 Conn. 488, 494, 472 A.2d 775 (1984)." (Citations omitted.) *Commissioner* v. *Freedom of Information Commission,* 204 Conn. 609, 621, 529 A.2d 692 (1987); *State* v. *Dupree,* 196 Conn. 655, 659, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985).

In *State* v. *Dupree,* supra, 657, the trial court sentenced a defendant convicted of arson murder under General Statutes § 53a-54d[11] to a term of life imprisonment, execution suspended after twenty-five years. The state appealed, arguing that the phrase in § 53a-54d that one convicted of arson murder must be "punished by life imprisonment and shall not be eligible for parole" precluded the trial court from suspending any portion of the life sentence. Id., 658. We held that § 53a-35a "instituted definite sentencing and effectively eliminated parole in Connecticut." Id., 659. "The effect of General Statutes § 53a-35a is to put the arson murder statute in the context of a definite sentencing scheme

---

[11] General Statutes § 53a-54d provides: "ARSON MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person. Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

and to render the phrase 'shall not be eligible for parole' in the statute meaningless. There is no reason to believe, however, that the legislature intended the entire statute to be without meaning or effect." Id., 659–60. We concluded that "[t]here is now nothing in the language of § 53a-54d . . . which explicitly prohibits the trial court from suspending a portion of that sentence." Id., 660.

We agree with the defendant to the extent that § 53a-35a implicitly repealed the *indeterminate sentencing* aspect of § 21a-278 (a). Cf. *State* v. *Dupree,* supra ("[t]his situation is analogous to that in which a portion of a statute is declared unconstitutional. If the statute is severable, the portion of the statute which is valid remains operative"); see also *Harper* v. *Tax Commissioner,* 199 Conn. 133, 141, 506 A.2d 93 (1986). We cannot conclude, however, that in enacting § 53a-35a, the legislature intended to leave standing the substantive offense set forth in § 21a-278 (a), but to eliminate punishment for a commission of that offense.

As was the arson murder offense at issue in *State* v. *Dupree,* supra, 662, the narcotics offense of § 21a-278 (a) is an "unclassified felony." Section 53a-35a (7) provides that "the sentence of imprisonment shall be a definite sentence and the term shall be . . . (7) for an unclassified felony, a term in accordance with the sentence specified in the section of the general statutes that defines the crime." The sentencing range specified in § 21a-278 (a) is "a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment." The effect of § 53a-35a is "to put [§ 21a-278 (a)] in the context of a definite sentencing scheme and to render the [indeterminate sentencing language] in the statute meaningless." *State* v. *Dupree,* supra, 659. Because the phrase "nor more than twenty years" contemplates indeterminate sentencing, § 53a-35a implicitly repealed that

language. Id.; *Harper* v. *Tax Commissioner,* supra. Thus, under § 53a-35a, the minimum sentence for a violation of § 21a-278 (a) is five years, and the maximum sentence is life imprisonment. The trial court in the present case therefore did not err in denying that portion of the defendant's supplemental motion to dismiss directed toward the indeterminate sentencing provisions of § 21a-278 (a). Moreover, the trial court complied with the definite sentencing requirement of § 53a-35a, as applied to § 21a-278 (a), by sentencing the defendant to a term of twenty-three years, execution suspended after fifteen years, and five years probation.

## VI

The defendant's last claim concerns the question whether his prosecution under General Statutes (Rev. to 1987) § 21a-278 (a) violated his due process and equal protection rights under the state and federal constitutions. Prior to the trial, the defendant filed a supplemental motion to dismiss, arguing that the Danbury state's attorney's office had charged similarly situated defendants under §§ 21a-277 and 21a-278 (b),[12] which

---

[12] "[General Statutes (Rev. to 1987)] Sec. 21a-277 (Formerly Sec. 19-480). PENALTY FOR ILLEGAL MANUFACTURE, DISTRIBUTION, SALE, PRESCRIPTION, DISPENSING. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marihuana, or a narcotic substance except as authorized in this chapter for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned.

"(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marihuana, except as authorized in this chapter, may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more seven years or be both fined and impris-

fix penalties less severe than the sentence of life imprisonment authorized by § 21a-278 (a). The trial court denied the defendant's motion.

Several months after the defendant had been convicted and sentenced, and after he had taken an appeal, he moved for a new trial, arguing that the § 21a-278 (a)

oned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned.

"(c) No person shall knowingly possess drug paraphernalia in a drug factory situation as defined by subdivision (20) of section 21a-240 for the unlawful mixing, compounding or otherwise preparing any controlled substance for purposes of violation of this chapter.

"(d) As an alternative to the sentences specified in subsections (a) and (b) of this section, the court may sentence the person to the custody of the commissioner of correction for an indeterminate term not to exceed three years or the maximum term specified for the offense, whichever is the lesser, and, at any time within such indeterminate term and without regard to any other provision of law regarding minimum term of confinement, the commissioner of correction may release the convicted person so sentenced subject to such conditions as he may impose including, but not limited to, supervision by suitable authority. At any time during such indeterminate term, the commissioner of correction may revoke any such conditional release in his discretion for violation of the conditions imposed and return the convicted person to a correctional institution."

See also General Statutes § 21a-278 (b), which provides: "(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marihuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

prosecution infringed his constitutional rights in that the state's attorneys' offices throughout Connecticut had been prosecuting similarly situated defendants for the less severe offenses. In connection with this motion, the defendant subpoenaed the state's attorneys for eleven of the twelve judicial districts, with the exception of Danbury. Eight of the eleven offices responded with letters and, in some cases, affidavits. The chief state's attorney's office filed a motion to quash the subpoenas. On August 2, 1988, the trial court conducted an evidentiary hearing on the motions. On September 14, 1988, the court issued a memorandum of decision, in which it granted the state's motion to quash the subpoenas, and denied the defendant's motion for a new trial.

The defendant concedes that the Danbury state's attorney's office "basically" prosecuted all cases that fell under § 21a-278 (a). Thus, in effect, the defendant has abandoned the claim raised in his pretrial motion to dismiss, and now focuses on allegations that the state's attorney's offices in the remaining eleven judicial districts have not so prosecuted such cases. A detailed analysis of the many facts and subissues surrounding the defendant's claim serves no rational purpose. "Absent a showing of a selection deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification . . . conscious selectivity in enforcement of the law is not in itself a constitutional violation. *Oyler* v. *Boles,* 368 U.S. 448, 456, 82 S. Ct. 501, 7 L. Ed. 2d 446 (1962). A defendant claiming discriminatory prosecution must show (1) that others similarly situated have generally not been prosecuted and that he has been singled out and (2) that he is the victim of invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protected right. *United*

*States* v. *Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974)." *State* v. *Haskins,* 188 Conn. 432, 474, 450 A.2d 828 (1982).

Even assuming that the state's attorney's offices in judicial districts other than Danbury have not prosecuted similarly situated defendants under § 21a-278 (a), an assertion we do not evaluate, the defendant's "selective prosecution" theory is meritless. He has not drawn our attention to any reported cases holding that incidental discrepancies in prosecutions between juridical divisions within a state, arising from the exercise of prosecutorial discretion, constitute "invidious discrimination." Cf. *State* v. *Fowler,* 193 N.C. 290, 293, 136 S.E. 709 (1927) (statute immunizing residents of five counties from prison sentence applicable to residents in all other counties violates equal protection). Moreover, the defendant had no constitutional right to transport cocaine with intent to sell. Absent an allegation of a cognizable instance of "invidious discrimination based on impermissible considerations such as race, religion, or the exercise of a constitutionally protected right"; *State* v. *Haskins,* supra; the defendant's selective prosecution claim is feckless. Consequently, the trial court did not err in denying the defendant's pretrial supplemental motion to dismiss and his motion for a new trial, or in granting the state's motion to quash the subpoenas.

There is no error.

In this opinion the other justices concurred.