STATE OF CONNECTICUT *v.* LEE RELLIFORD
(AC 21244)

Landau, Dranginis and Dupont, Js.

Argued January 18—officially released May 15, 2001

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Lawrence J. Tytla*, senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

### Opinion

DRANGINIS, J. The defendant, Lee Relliford, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), kidnapping in the first degree in violation of General Statutes § 53a-92, risk of injury to a child in violation of General Statutes § 53-21 (a) (2) and assault in the second degree in viola-

tion of General Statutes § 53a-60 (a) (2). On appeal, the defendant claims that the trial court improperly denied his (1) motion for a mistrial and (2) motion for a presentence psychiatric examination. We affirm the judgment of the court.

The jury reasonably could have found the following facts. On February 23, 1998, the defendant resided in New London with C and C's fourteen year old daughter A.[1] The defendant had known C for one year and had lived with her for three months. Shortly after 8 p.m. on February 23, 1998, the defendant came home and ordered C to get out of bed to go look at a new apartment with him. The defendant instead took C to a nearby coffee shop, accused her of having an affair and punched her in the face. The defendant then took a belt and wrapped it tightly around C's neck, continuing to accuse her of having an affair and claiming that he had proof because he had been tape-recording C for a week. The defendant forced C to listen to the tapes. C testified that "there wasn't anything on them [the tapes] except for noises. . . . The only thing I heard on it was the rustling of bags, nothing really . . . . With the rustling of the bags, he told me I was screwing somebody in the closet and then he told me I was screwing him on the bed and that's what he was making out of the sounds on the tapes."

The defendant continued to claim that the tapes proved C's unfaithfulness. When C denied that she was having an affair, the defendant called her a liar and punched her repeatedly, insisting that he was going to "find out who it was that [C] was screwing" and that he would beat the information out of her. The defendant and C left the coffee shop and for the rest of the night

---

[1] To comply with the provisions of General Statutes § 54-86e, the victims C and A were identified at trial by their first names only. Due to the distinctiveness of the names, this court will refer to them only by the first letter of those names.

the defendant drove around New London, continually striking and choking C. At one point during the night, the defendant locked C in the trunk while he fueled the car. After letting C out of the trunk, the defendant continued to beat her and accuse her of lying. The defendant then put C in the trunk for a second time. The defendant removed a crowbar and, as he did so, remarked that he could kill C with it. To stop the defendant from assaulting her, C claimed that her lover was her daughter's gym teacher. The defendant then agreed to take C home to her daughter.

On the morning of February 24, 1998, A was awakened by her mother's alarm clock, which went off at 6 a.m. When A went to her mother's room to shut the alarm off, no one was there. A then took a shower to get ready for school. While she was doing so, A heard the defendant and her mother come home. The defendant came into A's room and told her that her mother wanted her to stay home from school. The defendant also told A that he loved her and wanted her. When A went to check with her mother about school, she found C in bed crying, with the covers pulled completely over her. A asked her mother what was going on, and the defendant told C to "show her your face." The defendant, who now had a knife in his hand, commented that C "got what she deserved" for cheating on him.

The defendant then asked A, "Do you want it here or in there." He then told A to remove her clothes and that he would kill her if she did not do what he said. A then went to her room and removed her clothes. The defendant came in and told her to lay on her back. He then rubbed A's vagina with Vaseline and digitally penetrated her. The defendant told A to let her hair down and to get on her knees. He removed his pants, made A touch his penis and then asked her whether she wanted it "in the pussy or in the butt." He then anally raped A. When the defendant was through, he

told A to take a shower because she was "dirty." He also told C not to worry, that her daughter was "still a virgin." The defendant then took C and A to the hospital.

Following his arrest, the defendant was charged in a four count information with kidnapping in the first degree, assault in the first degree, sexual assault in the first degree and risk of injury to a child. The defendant was found guilty as charged on the first, third and fourth counts. On count two, the defendant was found guilty of the lesser included offense of assault in the second degree. On February 3, 2000, the court sentenced the defendant to a total effective term of sixty years. This appeal followed.

I

The defendant's first claim is that the court improperly denied his motion for a mistrial, which was based on C's testimony that the defendant had previously choked and raped her. During redirect examination, the prosecutor inquired how frequently the defendant had accused C of being unfaithful. C responded, "He on occasion would start a big fight, we'd have a big argument. One time he choked me and he raped me." The defendant immediately moved to strike the statement, and the court promptly ordered the jury to disregard the answer. After the completion of redirect examination, with the jury excused, the defendant moved for a mistrial, claiming that the prejudicial impact of the improper testimony could not be obviated by the court's curative instruction.

The court, in its oral decision on the oral motion for a mistrial, stated: "First, at least in the court's mind, it's eviden[t] that whatever statement [C] made was unintentional. I think it's agreed by everyone that there certainly was no attempt here for any misconduct on behalf of the state's attorney to attempt to elicit the information that [C] indicated. . . . There are occa-

sions when a court's curative instruction is not sufficient, and our appellate courts have made that clear. However, I don't think this is that case. The court promptly sustained the objection of the defense and in my mind anyway told the jury as emphatically as I could have told them that they were to disregard the testimony from the witness and disregard the answer that was given. . . . The issue for the court is whether it rises to the level that the jury believes that it can not now having been told to disregard it, whether [the defendant] can get a fair trial."

"The decision as to whether to grant a motion for a mistrial . . . is one that requires the trial court to exercise its judicial discretion. . . . Our review of the trial court's exercise of its discretion is limited to questions of whether the court correctly applied the law and could reasonably have concluded as it did. . . . Every reasonable presumption will be given in favor of the trial court's ruling. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion." (Citations omitted.) *State* v. *Lucci*, 25 Conn. App. 334, 341–42, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991).

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 350, 696 A.2d 944 (1997). "The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. . . . The trial court enjoys wide discretion in deciding whether a mistrial is warranted . . . and its evaluation as to events occurring before the jury is to be accorded the highest deference. . . . Every reasonable presump-

tion will be given in favor of the trial court's ruling . . . because the trial court, which has a firsthand impression of the jury, is in the best position to evaluate the critical question of whether the juror's or jurors' exposure has prejudiced a defendant. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion." (Internal quotation marks omitted.) *State* v. *Cruz*, 40 Conn. App. 515, 524, 672 A.2d 502, cert. denied, 237 Conn. 909, 675 A.2d 457 (1996). A reviewing court gives "great weight" to curative instructions in assessing error. *State* v. *McIntyre*, 250 Conn. 526, 534, 737 A.2d 392 (1999).

We conclude that the court did not abuse its discretion by denying the defendant's motion for a mistrial. Our review of the record reveals that the court's curative instruction adequately remedied any prejudicial impact C's statement may have had on the jury.

The statement by C in this case was isolated and made in response to a proper inquiry by the state as to how frequently the defendant had accused C of being unfaithful. The court found that the state attempted no misconduct in eliciting the statement. The court also reiterated, during the charge to the jury, that it must not consider any testimony that was excluded or stricken and told the jury to disregard testimony by C about alleged past conduct by the defendant. The court's remedy of instructing the jury to disregard C's answer and not to consider it a part of the evidence was adequate. The remedy was given immediately after the statement was made and established that the remark should not be considered in any way. See *State* v. *Young*, 56 Conn. App. 831, 838–41, 746 A.2d 795, cert. denied, 253 Conn. 904, 753 A.2d 939 (2000). We therefore conclude that no injustice occurred and the court did not abuse its discretion.

## II

The defendant's second claim is that the court improperly denied his motion for a presentence psychiatric examination pursuant to General Statutes § 17a-566 (a).[2] Specifically, the defendant argues that the court abused its discretion in denying the motion because the defendant's bizarre and delusional behavior of insisting that the unintelligible tapes he made contained evidence of C's infidelity demonstrated psychiatric disabilities.

On December 15, 1999, after the jury found the defendant guilty but prior to sentencing, the defendant filed

[2] General Statutes § 17a-566 (a) provides: "Except as provided in section 17a-574 any court prior to sentencing a person convicted of an offense for which the penalty may be imprisonment in the Connecticut Correctional Institution at Somers, or of a sex offense involving (1) physical force or violence, (2) disparity of age between an adult and a minor or (3) a sexual act of a compulsive or repetitive nature, may if it appears to the court that such person has psychiatric disabilities and is dangerous to himself or others, upon its own motion or upon request of any of the persons enumerated in subsection (b) of this section and a subsequent finding that such request is justified, order the commissioner to conduct an examination of the convicted defendant by qualified personnel of the division. Upon completion of such examination the examiner shall report in writing to the court. Such report shall indicate whether the convicted defendant should be committed to the diagnostic unit of the division for additional examination or should be sentenced in accordance with the conviction. Such examination shall be conducted and the report made to the court not later than fifteen days after the order for the examination. Such examination may be conducted at a correctional facility if the defendant is confined or it may be conducted on an outpatient basis at the division or other appropriate location. If the report recommends additional examination at the diagnostic unit, the court may, after a hearing, order the convicted defendant committed to the diagnostic unit of the division for a period not to exceed sixty days, except as provided in section 17a-567 provided the hearing may be waived by the defendant. Such commitment shall not be effective until the director certifies to the court that space is available at the diagnostic unit. While confined in said diagnostic unit, the defendant shall be given a complete physical and psychiatric examination by the staff of the unit and may receive medication and treatment without his consent. The director shall have authority to procure all court records, institutional records and probation or other reports which provide information about the defendant."

a motion requesting that the court order a psychiatric examination of him pursuant to § 17a-566 (a). The court denied the defendant's motion, concluding that while aspects of the defendant's behavior during the crimes were bizarre, the evidence failed to establish that the defendant was operating under any type of mental disease or defect.

"A court may order a psychiatric evaluation of a defendant only if it appears to the court that such person has a psychiatric disability and is a danger to himself or others. General Statutes § 17a-566. The trial court, acting on a motion pursuant to General Statutes § 17a-566, may rely on evidence such as psychiatric reports, the defendant's personal history and background, as well as the defendant's testimony and demeanor at trial. See *State* v. *Chance*, 236 Conn. 31, 62, 671 A.2d 323 (1996). It is within the discretion of the trial court to grant or deny such a motion. *State* v. *DeAngelis*, 200 Conn. 224, 241, 511 A.2d 310 (1986)." *State* v. *Maldonado*, 51 Conn. App. 702, 706, 725 A.2d 962, cert. denied, 249 Conn. 904, 733 A.2d 224 (1999).

"The purpose of an examination under [§ 17a-566] is not to determine competency to be sentenced. That section presumes that a convicted defendant will be sentenced. The purpose of an examination under [§ 17a-566] is to allow the commissioner of mental health to make recommendations as to certain offenders concerning the sentence to be imposed and the place of confinement." (Internal quotation marks omitted.) Id. Nevertheless, "[w]here the court has adequate psychiatric documentation of the defendant's mental condition, there is no need for it to utilize the statutory provisions concerning further examinations. . . . The presence of some degree of mental illness does not prevent or avoid the imposition of sentence by the court nor does it necessarily require that the court 'blindly and automatically implement the statutory machinery' providing for

psychiatric examinations." (Citation omitted.) *State* v. *Gates*, 198 Conn. 397, 405, 503 A.2d 163 (1986).

The court stated in its ruling on the motion: "I don't believe it would assist the court to have this type of an examination at this point because I think that the dearth of evidence is such that in the court's mind [it] would be speculative at best to believe that the actions of the defendant were such that they come within the parameters of [§] 17a-566 (a) to the extent that the court believes it needs the type of examination that [the defendant] seeks." As indicated by the trial court, the evidence failed to establish that the defendant's actions necessarily required an examination under § 17a-566 (a). There was no expert testimony of any mental disease or defect, no evidence of any prior or subsequent psychiatric disabilities, and no evidence in the record that the defendant would be dangerous to himself or to others in prison. Under these circumstances, the court did not abuse its discretion in denying the defendant's motion pursuant to § 17a-566 (a).

The judgment is affirmed.

In this opinion the other judges concurred.