STATE OF CONNECTICUT *v.* ROBERT L. FASANO
(AC 23770)

West, DiPentima and McLachlan, Js.

Argued October 28, 2004—officially released March 15, 2005

*Jeremiah Donovan*, for the appellant (defendant).

*Paul J. Narducci*, senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane*, state's attorney, for the appellee (state).

### Opinion

WEST, J. The defendant, Robert L. Fasano, appeals from the judgment of conviction, rendered after a jury trial, of possession of heroin with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b). On appeal, the defendant claims that the trial court improperly (1) instructed the jury on the element of possession, (2) denied his request that his business partner's wife, Maeyria Hernandez, be ordered to provide her fingerprints for impeachment purposes, (3) sustained the state's hearsay objection to the defendant's attempt to introduce certain testimony by Jose Hernandez, the defendant's business partner, and (4) denied his motion for a mistrial when, as the defendant alleges, the court improperly characterized certain evidence as "drug money." We disagree and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant to our disposition of the defendant's appeal. On February 2, 2001, members of the statewide narcotics task force (task force) and officers from the Groton town police department (police department) executed a search and seizure warrant in Groton at 47 South Road, apartment 8B, the residence of the defendant, his wife and their infant child. After entering the apartment and finding the defendant present, the authorities secured him with handcuffs and seated him on a living room couch. Soon thereafter, the defendant indicated

to the authorities that in his bedroom there was a large amount of cash that, according to him, belonged to Jose Hernandez. The authorities asked the defendant to show them where the cash was located. He directed them to a closet in his bedroom. There, on the top shelf, they discovered a small cardboard box[1] containing $19,250. The money was stacked in the box in $1000 rolls.[2]

After locating the box and the money, the authorities returned the defendant to the living room, explained to him his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and then took his statement, which they reduced to writing.[3]

---

[1] A certified latent fingerprint examiner with the state forensic laboratory was able to lift a single latent fingerprint from the box. It did not match the inked fingerprints of the defendant, Jose Hernandez or a third individual arrested in connection with the police investigation in this case. The examiner also was unable to match the fingerprint to any of those stored in the state's fingerprint database. The examiner did not attempt to match the latent fingerprint with any of Maeyria Hernandez' fingerprints.

[2] One roll contained $1250. The money consisted of nineteen $100 bills, forty $50 bills, seven hundred, twenty-seven $20 bills, seventy-four $10 bills, thirteen $5 bills and five $1 bills. At trial, Sergeant James Morin of the task force testified that the standard price for a single glassine bag of heroin is $20.

[3] The defendant's statement provides: "I know Jose and Maeyria Hernandez. They live on Shennecosset [Road] Groton [Connecticut]. Jose asked me to hold . . . onto some money for him. It began in December, 2000. Jose asked me to hold onto some money for him. He said he would pay me for it. I didn't ask why, but I suspected that he was a drug dealer and it was drug dealer money. He kept the box here for about two days. I saw inside the box, and it had a lot of money in it. Today Maeyria came over to my apartment. She had a bag. Inside the bag was a box of money. She told me that the police had stopped 'Cano' and needed to hide the money. She put the box in the closet of my bedroom. The box was the one I showed the police. I don't sell drugs. I only held the money for Jose and Maeyria. I don't know Cano. I never met him. The BMW is Jose['s]. I have the key because he lets me use it. I don't know where the heroin came from. It must have been in the bag when Maeyria came."

Detective John W. Varone of the police department testified at trial that as he and another officer were finalizing the defendant's written statement, Officer Al Smythe, a member of the police department who was assigned to the task force, reported that officers found a quantity of narcotics in the closet. Prior to that point in time, according to Varone's testimony, the

While the defendant was giving his statement, other members of the task force and the police department continued searching the residence. On the same closet shelf, several feet away from where they had found the box of money, the authorities discovered an envelope with the defendant's name on it. It contained 100 glassine bags that were stamped with the logo "dead presidents."[4] Their contents field tested positive for heroin.[5] Laboratory analysis later established that the seized substance was, in total, five grams of heroin.[6]

In an amended, one count information, the defendant was charged with possession of heroin with intent to sell by a person who is not drug-dependent in violation of § 21a-278 (b). At trial, the defendant proffered the testimony of Jose Hernandez, who testified that he, not the defendant, sold heroin and, unbeknownst to the defendant, placed the heroin in question in the defendant's closet. During closing arguments, the state suggested that the jury should question the credibility of Jose Hernandez' testimony in light of, among other things, his earlier testimony that he considered it "important that [he] have the heroin to sell" in order to support his addiction to cocaine. The jury returned

defendant had asserted that there were no narcotics within the residence. Sergeant James Morin of the task force also testified that the defendant previously had claimed that there were no drugs in the residence.

[4] That same day, the police executed search warrants at the Hernandez residence and at a third apartment to which Jose Hernandez had access. The police recovered more than 1500 bags of heroin at the latter location and an unspecified sum of money at the former location. The 1500 bags, like the 100 bags found at the defendant's apartment, bore the logo "dead presidents."

[5] At trial, Sergeant James Morin of the task force testified that in southeastern Connecticut, heroin for sale is generally packaged in a glassine bag on which there is some type of stamp or logo.

[6] Prior to trial, in his statement to the police, the defendant suggested that his business partner's wife, Maeyria Hernandez, must have placed the heroin in his closet when she delivered a box to him. See footnote 3. Maeyria Hernandez testified at trial, however, that she did not go into any room other than the defendant's living room.

a verdict of guilty. The court subsequently committed the defendant to the custody of the commissioner of correction for thirteen years, execution suspended after nine years, and five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The defendant first claims that the court improperly instructed the jury on the element of possession with respect to the charge of possession of heroin with intent to sell in violation of § 21a-278 (b). Specifically, the defendant argues that the court improperly instructed the jury on "constructive possession" by instructing that the jury could consider him to be in possession of the heroin "[a]s long as the substance [was] in a place where it [was] subject to the defendant's dominion and control, where the defendant [could], if he wish[ed], go and get it," and by not explicitly instructing that the jury must find that he had the intent to control the heroin.[7] The defendant argues that the instructions

---

[7] The court instructed the jury regarding the element of possession in relevant part: "Now, in this case, the defendant is charged with the offense of possession of a narcotic substance with the intent to sell it in violation of a particular statute. Insofar as applies here, that statute provides [that] any person who possesses with the intent to sell a narcotic substance shall be guilty of this particular crime. . . . As a matter of law, I instruct you that heroin is a controlled substance. It is also a narcotic substance.

"Now, in order for the state to prove guilt here, it must prove three elements. There are three elements to the crime of possession of heroin with intent to sell. The first element, which I'll shorthand the possession element, is that the defendant had to have possession of a substance. Two, that the substance possessed was heroin. I'll shorthand that as the heroin element. And the third element is that the defendant had to possess this heroin substance with the intent to sell it. . . . I'm going talk in some detail about them.

"The first element is that the defendant had possession of a substance. This element of possession means that the defendant has two aspects. One aspect is that he had possession and, as a part of that possession, knew that it was heroin. And what we're talking about here is a material in question in exhibit ten. That's what this case is about. Did the defendant knowingly have possession of that material? Was that material heroin and he knew it to be heroin? And, finally, did he possess it with the intent to sell?

improperly could have allowed the jury to find him guilty if it determined that "he knew that heroin was present in his apartment and was able to retrieve it if he wanted to do so, even though he had no intention to ever exercise dominion and control." Reading the jury instructions as a whole, we disagree with the defendant.

Although the defendant failed to object to the court's instructions, he requests review of his claim pursuant

"So, the element of possession, the state must prove that the defendant knew the substance was heroin, that he knew of its presence, and that he exercised dominion and control over it. It is not necessary that the defendant actually had the substance on his person, although that is one form of possession. It means having dominion and control over the substance even though it is not on his person. *As long as the substance is in a place where it is subject to the defendant's dominion and control, where the defendant can, if he wishes, go and get it, it is in his possession.* And that possession is illegal if he knew the substance was heroin and knew of its presence. Ownership and possession are not equals. The state doesn't have to prove that the substance was owned by the defendant or the defendant was its owner. The state merely has to prove possession. And more than one person can have possession of an item.

"In other words, in order to prove the possession element, the state does not have to prove that the defendant had exclusive possession of it. Whether the defendant had possession of the substance, the stuff—excuse me, the material in exhibit ten, is a question of fact for you to decide. And you may, as I have told you, draw reasonable and logical inferences from the evidence.

"In this connection, there is another rule that I [shall] make you aware of. The rule is this: Where the defendant is not in exclusive possession of the premises where the narcotics are found, *you may not infer that he knew of their presence and that he had actual control of them unless he made some incriminating statement or unless there are other circumstances which tend to support such an inference.* Therefore, if you find that the defendant was not in exclusive possession of the premises where the narcotics were found or supposed narcotics were found, and *in order to infer that he knew of their presence and that he was in control of them, you must also find that he made some incriminating statements or that there are other circumstances which tend to support the inference.*

"If, however, you find from all the facts and circumstances that the defendant was in exclusive possession of the premises where exhibit ten was found, you may also infer that he knew of their presence there and that he had control of them. And that situation, in order to infer that he knew of their presence and that he was in control of them, you do not have to find that he made some incriminating statement or that there are other

to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[8] We review the claim under *Golding* because we conclude that the record is adequate for review and the claim is of constitutional magnitude. "[A]n improper jury instruction as to an essential element of the crime charged may result in the violation of the defendant's due process right to a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 70 Conn. App. 393, 398, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002).

The standard of review for constitutional claims of improper jury instructions is well established. "In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted;

circumstances supporting the inference of possession and control. Now, I've been talking about the first element of the offense, mainly possession." (Emphasis added.)

[8] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 182, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

When, as here, a defendant is charged with possession of narcotics with intent to sell and the contraband is not found on his person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. See *State* v. *Berger*, 249 Conn. 218, 225, 733 A.2d 156 (1999) (constructive possession of cocaine); *State* v. *Elijah*, 42 Conn. App. 687, 698, 682 A.2d 506 (same), cert. denied, 239 Conn. 936, 684 A.2d 709 (1996). "To prove . . . constructive possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence, and exercised dominion and control over it. *State* v. *Brunori*, 22 Conn. App. 431, 435–36, 578 A.2d 139, cert. denied, 216 Conn. 814, 580 A.2d 61 (1990) . . . ." (Citation omitted.) *State* v. *Cruz*, 28 Conn. App. 575, 579, 611 A.2d 457 (1992). In our criminal statutes concerning possession, control of the object must be exercised intentionally. *State* v. *Hill*, 201 Conn. 505, 516, 523 A.2d 1252 (1986). That intent may be proved by circumstantial evidence. See *State* v. *Little*, 194 Conn. 665, 675, 485 A.2d 913 (1984).[9]

In *State* v. *Elijah*, supra, 42 Conn. App. 687, as in the present case, "[t]he defendant specifically challenge[d] the court's instruction that the defendant would be in [constructive] possession of the narcotic substance if

---

[9] In *State* v. *Jarrett*, 82 Conn. App. 489, 845 A.2d 476, cert. denied, 269 Conn. 911, 852 A.2d 741 (2004), we decided that "[b]ecause the court instructed the jury that it must find that the defendant exercised *direct control* over the alleged contraband, we conclude that the jury was instructed properly on intentional control." (Emphasis added.) Id., 496. We note that *Jarrett* did not hold that a "direct control" instruction, or something analogous thereto, is always required. Therefore, the fact that the instructions in the present matter did not contain such language does not mean that they were improper.

it was located in a place where '*the defendant could, if he wishe[d], go and get it,*' being aware of its presence and unlawful character.[10] He argue[d] that this could improperly allow the jury to convict him solely on his knowingly being in the physical proximity of the drugs. We agree[d] that if the narcotics [were] found in a place where the defendant [did] not have exclusive possession, the mere presence of the defendant near the contraband, without more, [would be] insufficient to support an inference of possession. . . . *We also agree[d] that that portion of the instruction dealing with the ability to 'go and get' the contraband, if taken alone, would be insufficient to define possession.*"[11] (Citation omitted; emphasis added.) Id., 693. The trial court in *Elijah,* however, did not limit its definition to the "go and get it" language. Explaining constructive possession to the jury, the trial court in *Elijah* initially stated: "The first element is that the defendant had possession of a substance. This element of possession means that the defendant knew of its presence and that the defendant actually had the substance on his person, although that is only one form of possession. The word possession as used in [§ 21a-278 (b)] has no technical meaning. As I have said, it does not mean that one must have the illegal substance upon his person. Rather, a person who, although not in actual possession, knowingly has the power and the *intention* at a given time *to exercise dominion and control* over a thing is

---

[10] Specifically, the trial court in *Elijah* stated: "As long as the substance is or was in a place where the defendant could, if he wishes, go and get it, it is in his possession and that possession is illegal if the defendant knew of the unlawful character of the substance and knew of its presence." (Internal quotation marks omitted.) *State* v. *Elijah,* supra, 42 Conn. App. 692.

[11] The defendant in the present case shared the premises in question with his wife. The defendant and his business partner, Jose Hernandez, also shared a room in the premises as their business office. As such, Jose Hernandez possessed a key to the defendant's apartment. It would appear, therefore, that the jury could not reasonably have inferred *automatically* that the defendant possessed the heroin.

deemed to be in *constructive possession* of that item. It means *having something under one's control* or dominion." (Emphasis added; internal quotation marks omitted.) Id., 691–92. Considering that initial statement by the trial court, we then commented that "[t]he trial court properly instructed as to the element of possession that the defendant was required not only to know of the presence of narcotics, but also that he *intended to* and did *exercise dominion and control* over the drugs"; (emphasis added) id., 693; and that "the instruction sufficiently charged that [constructive possession] involves 'knowingly' having the power and *intention* at a given time *to exercise dominion or control.*" (Emphasis added.) Id., 694.

Recognizing that the "go and get it" language used by the trial court in *Elijah*,[12] if taken alone, would be insufficient to define constructive possession and, therefore, insufficient to convey the requirement of intentional control; see id., 693; we ask ourselves whether the court here, in charging the jury, limited its definition of constructive possession to that language. After carefully reviewing the charge as a whole, we do see language that is similar to the "go and get it" language in *Elijah*. The court in the present case stated: "As long as the substance is in a place where it is subject to the defendant's dominion and control, where the defendant can, if he wishes, go and get it, it is in his possession." We note, however, that the court did not limit its definition of constructive possession to that language. Explaining actual and constructive possession to the jury, the court also stated: "So, the element of possession, *the state must prove that the defendant knew the substance was heroin, that he knew of its presence, and that he exercised dominion and control over it.* It is not necessary that the defendant actually had the substance on his person, although that is one

---

[12] See footnote 10.

form of possession. It means having dominion and control over the substance even though it is not on his person. . . . [T]here is another rule that I [shall] make you aware of. The rule is this: Where the defendant is not in exclusive possession of the premises where the narcotics are found, you may not infer that he knew of their presence and that he had actual control of them unless he made some incriminating statement or unless there are other circumstances which tend to support such an inference. Therefore, if you find that the defendant was not in exclusive possession of the premises where the narcotics were found or supposed narcotics were found, and *in order to infer that he knew of their presence and that he was in control of them,* you must also find that he made some incriminating statements or that there are other circumstances which tend to support the inference." (Emphasis added.)

Clearly, that additional language does not contain any specific reference to "intentional control" or " 'intention . . . to . . . control,' " as in *State* v. *Elijah,* supra, 42 Conn. App. 692,[13] that would convey to the jury explicitly the intentional control element of constructive possession. Nevertheless, we conclude that the quoted language was sufficient to define constructive possession; see *State* v. *Hernandez,* 254 Conn. 659, 669, 759 A.2d 79 (2000) (" '[t]o prove either actual or constructive possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence, and exercised dominion and control over it' "); *State* v. *Cruz,* supra, 28 Conn. App. 579; and to convey to the jury the element of intentional control.

---

[13] The trial court in *Elijah* stated in relevant part that "a person who, although not in actual possession, knowingly has the power and the *intention* at a given time *to exercise* dominion or *control* over a thing is deemed to be in constructive possession of that item. It means having something under one's control or dominion." (Emphasis added.) *State* v. *Elijah,* supra, 42 Conn. App. 692.

We conclude as much because, for reasons we will discuss, we do not believe, as the defendant urges, that a trial court is always required to reference *intentional* control explicitly when defining constructive possession to a jury. See *State* v. *Jarrett*, 82 Conn. App. 489, 496, 845 A.2d 476 ("hold[ing] that a separate instruction on the requirement of intentional control need not be provided in every instance"), cert. denied, 269 Conn. 911, 852 A.2d 741 (2004).

The defendant contends that the absence of an explicit instruction on intentional control in many Connecticut cases involving "constructive possession" is an accident of case history. He asserts that *State* v. *Harris*, 159 Conn. 521, 271 A.2d 74 (1970), cert. dismissed, 400 U.S. 1019, 91 S. Ct. 578, 27 L. Ed. 2d 630 (1971), established the modern concept of possession in Connecticut by endorsing the statement: "Possess, as used in criminal statutes, ordinarily signifies an *intentional control* of a designated thing accompanied by a knowledge of its character." (Emphasis added; internal quotation marks omitted.) Id., 531. The defendant also cites *State* v. *Avila*, 166 Conn. 569, 573, 353 A.2d 776 (1974), in which the defendant, who had been charged with possession of heroin with intent to sell or to dispense, requested that the trial court instruct the jury, in relevant part, that "to be found guilty, [he] must have exercised dominion and control over the heroin, had knowledge of its presence, and had knowledge of its narcotic character." The trial court there, however, declined to use the defendant's requested language in its jury instructions. Instead, it used the language that our Supreme Court endorsed in *Harris*. See id. On appeal, the Supreme Court concluded that the trial court "correctly charged the jury on the dominion and control of the narcotics necessary to establish possession." Id.

By focusing on those two cases and on our Supreme Court's approval in them of language that explicitly mentioned "intentional control," the defendant suggests that our Supreme Court was requiring trial courts to reference "intentional control" explicitly in their jury instructions on constructive possession. Attempting to demonstrate what he characterizes as an accidental omission of the "intentional control" language from jury instructions on constructive possession, the defendant identifies several cases decided after both *Avila* and *Harris* in which this court and the Supreme Court cited with approval a definition of constructive possession that does not explicitly reference intentional control, but actually mirrors the rejected instructions suggested by the defendant in *Avila*.[14]

Since *Avila* and *Harris*, we and the Supreme Court have often defined constructive possession without explicitly referencing intentional control.[15] Likewise, we have held jury instructions on constructive possession to have been adequate when they did not reference intentional control explicitly and when, similar to the rejected instructions suggested by the defendant in *Avila*, they employed language like the following: In order to prove illegal possession of a narcotic sub-

---

[14] The defendant cites in his brief *State* v. *Delossantos*, 211 Conn. 258, 277–78, 559 A.2d 164 (" 'to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it' "), cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); *State* v. *Alfonso*, 195 Conn. 624, 633, 490 A.2d 75 (1985) (same); *State* v. *Williams*, 169 Conn. 322, 335, 363 A.2d 72 (1975) ("court correctly instructed the jury that to establish that the defendant had possession of narcotics it was necessary to prove that he had exercised dominion and control over the substance, had knowledge of its presence, and had knowledge of its narcotic character"); *State* v. *Frazier*, 39 Conn. App. 369, 378, 665 A.2d 142 (1995) ("to 'prove possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of the character of the drug and its presence and exercised dominion and control over it' ").

[15] See, e.g., footnote 14.

stance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it.[16] In so defining and holding, however, we have not flouted any requirement that trial courts must always explicitly include reference to intentional control in their explanations to juries of constructive possession. There is no such universal requirement. We believe that *Avila* merely approved of the "intentional control" language as an acceptable substitute for the "exercised dominion and control" language that many of today's courts typically use to explain in part constructive possession. A typical, full explanation of constructive possession provides: "To prove . . . constructive possession of a narcotic substance, the state must establish beyond a reasonable doubt that the accused knew of [1] the character of the drug and [2] its presence, and [3] exercised dominion and control over it." *State* v. *Cruz*, supra, 28 Conn. App. 579; accord *State* v. *Hernandez*, supra, 254 Conn. 669, quoting *State* v. *Cruz*, supra, 579; *State* v. *Berger*, supra, 249 Conn. 225; *State* v. *Delossantos*, 211 Conn. 258, 277, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); *State* v. *Brunori*, supra, 22 Conn. App. 435–36.

In *Avila*, although the Supreme Court upheld jury instructions that clearly included an explicit reference to the intentional control element of constructive possession, the court did not conclude that the jury instructions must have included such an explicit reference. Rather, in addition to finding that certain portions of the jury instructions adequately conveyed the first two elements of possession, namely, knowledge of the drug's character and knowledge of its presence,[17] the

---

[16] See, e.g., *State* v. *Nesmith*, 220 Conn. 628, 634 n.9, 600 A.2d 780 (1991).

[17] With respect to those two elements of possession, our Supreme Court noted the trial court's use of the following language: " '[P]ossess,' as used in criminal statutes, ordinarily signifies an intentional control of a designated thing *accompanied by a knowledge of its character*." (Emphasis added; internal quotation marks omitted.) *State* v. *Avila*, supra, 166 Conn. 573. Our

court simply noted that by using the "intentional control" language, "[t]he [trial] court correctly charged the jury on the [third element of constructive possession, which is] dominion and control of the narcotics necessary to establish possession." *State* v. *Avila,* supra, 166 Conn. 573. This lack of any conclusion by our Supreme Court that jury instructions must explicitly reference intentional control combined with later explanations of constructive possession by the Supreme Court that do not explicitly reference intentional control[18] leads us to conclude that the court meant only to endorse the "intentional control" language as an alternative to the "dominion and control" language that was suggested by the defendant in *Avila* and that is commonly used today.

It is difficult to imagine that the jury in the present case, having first been asked to determine whether the defendant knew of the heroin's presence and of its nature as a narcotic, could have interpreted the court's further instruction to determine whether he exercised control over the heroin as including control that was not intentional. We believe that by prefacing its instruction to determine whether the defendant exercised dominion and control with its instruction to determine whether he knew of the heroin's presence and of its character,[19] the court implicitly and adequately conveyed to the jury that his control of the heroin must have been intentional.

It is likewise difficult to imagine that the jury could have understood the court as including unintentional

___

Supreme Court also noted that the trial court gave "specific instructions on intent to sell 'a *narcotic* drug' " and instructed the jury that " '[i]t is essential that . . . the State must prove that . . . the accused did *knowingly possess a narcotic drug* . . . .' " (Emphasis added.) Id., 574.

[18] See, e.g., *State* v. *Hernandez,* supra, 254 Conn. 669; *State* v. *Berger,* supra, 249 Conn. 225–26; *State* v. *Delossantos,* supra, 211 Conn. 276–78.

[19] See footnote 7, paragraph four.

control when instructing that the jury could, where the defendant was not in exclusive possession of the premises, infer from either incriminating statements or circumstances that he knew of the heroin's presence and that he was in control of it. In that portion of the instruction,[20] like that portion described previously, the element of knowledge of presence precedes and is tied to the element of control. As such, we believe that the jury understood that the defendant's control must have been intentional.

Recalling our standard of review for constitutional claims of improper jury instructions, we therefore conclude that the court's instructions, read as a whole, adequately defined constructive possession and adequately apprised the jury of the intentional control element of that concept. As such, it is not reasonably possible that the jury was misled into believing that it could find the defendant guilty as long as it found that he knew of the heroin's presence and of its nature as a narcotic, regardless of whether he had any intent ever to exercise dominion and control. The defendant, therefore, was not deprived of a fair trial on the basis of improper jury instructions.[21] Accordingly, the defendant's claim fails because it does not satisfy *Golding*'s third prong.[22]

## II

The defendant next claims that the court improperly denied his request that Maeyria Hernandez be ordered

[20] See footnote 7, paragraph six.

[21] We note that the defendant merely objects to the jury charge and does not mount a separate appellate attack on the sufficiency of the evidence supporting the verdict. In the absence of such an attack and in light of our determination that the court adequately addressed each element of possession in its instructions to the jury, we will not disturb the product of the jury's considered deliberations. See *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 246 n.40, 828 A.2d 64 (2003).

[22] See footnote 8.

to provide her fingerprints for impeachment purposes. Maeyria Hernandez testified on cross-examination that she delivered to the defendant a bag that Jose Hernandez had told her contained business papers. She also testified that she did not open the bag and, therefore, was unsure if the bag contained anything other than the purported papers. Earlier on direct examination, however, when asked what the papers were contained in, she commented that she "didn't open the box," indicating, according to the defendant, that she perhaps did open the bag, see a box and touch it. She further testified that when she delivered the papers to the defendant, she limited her visit to his living room, indicating, contrary to his assertion, that she did not place the box in his bedroom closet.

The defendant argues that by testifying on direct examination that she "didn't open the box," Maeyria Hernandez acknowledged that she at least knew of its presence in the bag and, perhaps, that she touched it.[23] He further argues that by testifying on cross-examination that she did not open the bag, and therefore that she did not see a box or touch one, Maeyria Hernandez

_____

[23] On appeal, a debate developed at oral argument over whether the unidentified fingerprint was found "in" the box or "on" the box. The defendant argued that it was found "in" the box and that if fingerprint analysis proved that it belonged to Maeyria Hernandez, that proof could be used to impeach her testimony that she did not open the box. The record, however, does not indicate that there was any dispute at trial over whether the fingerprint was found "in" the box or "on" the box. With respect to Maeyria Hernandez' testimony concerning the bag and the box, the record reveals only that the defendant took issue at trial with the apparent ambiguity between (1) her testimony that she did not open the bag and, therefore, did not see a box and (2) her testimony that she "didn't open the box," indicating that, perhaps, she did open the bag and see a box. Despite whether the dispute concerns (1) fingerprints being "in" the box or "on" the box or (2) Maeyria Hernandez' having opened or not having opened the bag, the outcome of whether the sought after nontestimonial evidence should have been admitted is the same. On the ground of irrelevance, as discussed in this opinion, the court acted within its discretion to deny the defendant's motion to compel Maeyria Hernandez to submit to fingerprint analysis.

contradicted her previous testimony. Given that Maeyria Hernandez also testified on direct examination that she did not enter any room other than the defendant's living room, the defendant argues that if fingerprint analysis of Maeyria Hernandez conclusively proved that an unidentified fingerprint found on the box[24] belonged to her, that evidence could have been used to impeach her testimony that she did not open the bag. That, he further argues, would cast doubt on the veracity of her testimony that she limited her visit at the defendant's apartment to the living room.[25]

The defendant claims that by denying his motion to compel Maeyria Hernandez to submit to fingerprint analysis for the purpose of impeaching her testimony, the court violated his rights to compulsory process, to confront witnesses and to present a defense. We disagree.[26]

Under both the constitution of the United States and the constitution of Connecticut, the right to confront witnesses and the right to present a defense are fundamental to a fair trial. See U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Aponte*, 249 Conn. 735, 749, 738 A.2d 117 (1999); *State*

---

[24] See footnote 1.

[25] Discussing the sought after evidence, defense counsel stated to the court: "I do think, in this matter, there's a significant impact on her testimony as to whether or not that money was placed [in the closet] by [Maeyria Hernandez] . . . ."

[26] On appeal, the defendant concedes that our rules of practice do not specifically provide a trial court with the authority to order a witness to submit to physical examination. Without providing any supporting case law, he argues, however, that a defendant's right to compulsory process should be broadly interpreted so as to allow a trial court to order a state's witness to provide nontestimonial evidence that might contribute to an adequate defense. Given our disposition of that claim on the ground of irrelevance, we decline to consider whether, when relevance has been established, the right to compulsory process authorizes a court to order a witness to provide nontestimonial evidence, specifically fingerprints.

v. *Ritrovato*, 85 Conn. App. 575, 579 n.5, 858 A.2d 296, cert. granted on other grounds, 272 Conn. 905, 863 A.2d 699 (2004). Those rights, however, are subject to reasonable limitations, such as "the trial court's right, indeed, duty, to exclude irrelevant evidence. The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 219, 690 A.2d 1370 (1997). "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . [T]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citation omitted; internal quotation marks omitted.) Id., 219–20.

" 'Relevance' does not exist in a vacuum. Under traditional definitions, to be relevant, a fact must be *'material,'* a term which [Fed. R. Evid.] 401 replaces with the phrase, 'fact that is *of consequence* to the determination of the action.' " (Emphasis added.) 2 C. Fishman, Jones on Evidence (7th Ed. 1994) § 11:3, p. 260. "Relevant evidence," according to § 4-1 of the Connecticut Code of Evidence, is "evidence having any tendency to make the existence of any fact that is *material* to the determination of the proceeding more probable or less probable than it would be without the evidence." (Emphasis added.) "To determine whether a fact is 'material' or 'consequential,' it is necessary to examine the issues in the case, as defined by the underlying substantive law, the pleadings, applicable pretrial orders, and events that develop during the trial. Thus, the relevance of an offer of evidence must be assessed

against the elements of the cause of action, crime, or defenses at issue in the trial. The connection to an element need not be direct, so long as it exists. Once a witness has testified to certain facts, for example, his credibility is 'a fact that is of consequence to [or material to] the determination of the action,' *and evidence relating to his credibility is therefore relevant—but only if the facts to which the witness has already testified are themselves relevant to an element of a crime, cause of action, or defense in the case.*" (Emphasis added.) 2 C. Fishman, supra, pp. 260–61.

As stated previously, Maeyria Hernandez testified about certain facts, specifically, that she never touched the box in question and, contrary to the defendant's assertion that she placed the box in his bedroom closet, that she limited her visit to his living room. Having testified about those facts, her credibility became a fact material to the determination of the proceedings, and evidence relating to her credibility, namely, the sought after fingerprint analysis, would be relevant—*but only if* the aforementioned facts about which she testified were themselves relevant to an element of the crime or to an element of the defense in the case. See id. Indeed, the defendant argued that a positive fingerprint analysis of Maeyria Hernandez would be relevant to her credibility as a witness. He neither demonstrated nor explained to the court, however, how her testimony that she limited her visit to the defendant's living room and did not place a box in his closet, was relevant to an element of the crime or to an element of the defense in the case. It would be improper for this court or the trial court to speculate what that relevance may be. See *State* v. *Andrews*, 248 Conn. 1, 12, 726 A.2d 104 (1999) (proffering party bears burden of establishing relevance of offered evidence); *State* v. *Beall*, 61 Conn. App. 430, 438, 769 A.2d 708 (same), cert. denied, 255 Conn. 954, 772 A.2d 152 (2001); *State* v. *Nunes*, 58 Conn. App. 296,

304, 752 A.2d 93 (same), cert. denied, 254 Conn. 944, 762 A.2d 906 (2000).

Even if we assume that knowing who placed the box in the closet was relevant to an element of the crime or to an element of the defense, we do not believe, as § 4-1 of the Connecticut Code of Evidence requires, that a positive fingerprint analysis of Maeyria Hernandez would have any tendency of making more probable the defendant's allegation that she placed the box in the closet. It would merely demonstrate that she held the box, which, despite her seemingly ambiguous testimony, the jury already reasonably could have concluded, given the defendant's statement to the police that Maeyria Hernandez brought the box in question to his apartment[27] and given Jose Hernandez' testimony that he gave the box to her to deliver to the defendant.[28] It would not demonstrate, nor could it demonstrate even to the slightest degree, that Maeyria Hernandez left her fingerprint on the box as she placed it in the closet.

The court, therefore, did not abuse its discretion in denying, on the ground of irrelevance, the defendant's request that the court order Maeyria Hernandez to provide her fingerprints. Accordingly, the defendant's claim fails.

### III

The defendant next claims that the court improperly sustained the state's hearsay objection to his attempt to introduce on direct examination Jose Hernandez' testimony that he previously had told the police that the defendant was not involved in his drug activities.

---

[27] The relevant portion of the defendant's statement reads: "Today Maeyria came over to my apartment. She had a bag. Inside the bag was a box of money. . . . The box was the one I showed the police."

[28] Jose Hernandez testified in relevant part: "I took the box and some documents, put them in a bag and I gave them to [Maeyria Hernandez] and I told her [to] take this to [the defendant] . . . ."

The defendant asserts that the testimony should have been allowed as an exception to the hearsay rule as a prior consistent statement offered to rehabilitate a witness who was impeached by a claim of recent fabrication. We disagree.

The standard of review by which this court reviews a challenge to a trial court's evidentiary ruling is well established. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, supra, 249 Conn. 229–30; see also *State* v. *Rivera*, 40 Conn. App. 318, 324, 671 A.2d 371 (1996).

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies. . . . Prior consistent statements of a witness are generally regarded as hearsay and are not admissible at trial, either for their truth or for the purpose of rehabilitating a witness' damaged credibility. . . . The rationale upon which this rule is based is that the witness' story is not made more probable or more trustworthy by any number of repetitions of it. . . . This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness *who has been impeached* by a prior inconsistent statement . . . by the suggestion of bias, motive, or interest arising after the time the prior consis-

tent statement was made . . . *by a claim of recent fabrication* . . . or by a claim of faulty memory . . . . When a prior consistent statement is admitted under any of these exceptions, it is admitted to affect credibility only and *not to establish the truth of the statement.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 803–804, 709 A.2d 522 (1998).

Although, as the defendant asserts, the state may have attacked Jose Hernandez' credibility as a witness during cross-examination and during closing arguments, we note that it had not yet done so when defense counsel attempted on direct examination to elicit from Jose Hernandez the hearsay testimony. As such, Jose Hernandez had not yet been impeached when the court sustained the state's objection to the defendant's attempt to introduce the hearsay testimony. The court, therefore, did not abuse its discretion in sustaining the state's objection because the witness had not yet been impeached. See *State* v. *Mitchell*, 8 Conn. App. 598, 604–605, 513 A.2d 1268 (court within its discretion to disallow question asked on direct examination in anticipation of potentially damaging impeachment evidence on cross-examination), cert. denied, 201 Conn. 810, 516 A.2d 887 (1986). Accordingly, the defendant's claim must fail.

## IV

Finally, the defendant claims that the court improperly denied his motion for a mistrial after, as the defendant alleges, the court improperly characterized the $19,250 in evidence as "drug money."

During its closing argument, the state asserted that the defendant told the police in his statement that he *knew* the $19,250 found in the closet was drug money. Defense counsel objected to that assertion, arguing that the defendant said in his statement only that he thought

it was drug money, not that he knew it was drug money. Given the state's apparent mischaracterization of the defendant's words, the court issued the following curative instruction: "Now, certain things are not evidence and should not in any way be taken as establishing any facts. I'm going to name some—several of the things which are not evidence. Arguments and statements by the lawyers are not evidence. The lawyers are not witnesses, what they have said in their closing arguments or at other times during the trial where you have seen some exchange between the lawyers where I was asked to make an evidentiary ruling. Statements during those arguments are not evidence. Now, the lawyers had every right to argue to you and state what they understood to be the facts, but it's your recollection which controls, and it's up to you whether or not you will base your verdict on those alleged facts emphasized by either of the lawyers.

"Now, during the arguments which you just heard, one of the lawyers may have said, in referring to the drug money found in the closet—excuse me, I'm committing a similar error. In connection with the box of money, which is an exhibit here, that [the defendant] said he knew the money was drug money. It's my recollection that the evidence was that [the defendant] said he suspected the money was drug money. But this is where your recollection controls. What I have said or described the evidence [as] or how the lawyers may have done it doesn't make any difference, what I said or what the lawyers said. It's how you recollect the evidence."

The defendant excepted to the curative instruction, noting his concern with the court's own characterization of the money as "drug money." Following some discussion outside the presence of the jury, the court issued a second curative instruction: "In the course of my instructions to you, I—hope inadvertently—believe

I inadvertently characterized . . . the evidence, and perhaps the most glaring example of that is my referring to the money as drug money. Now, there's conflicting evidence on whether that money found in the closet was drug money or some other money borrowed as a result of the sale of a car, etc., to be used in the cleaning business. You're the jury. Do not take my descriptions of the evidence as worth anything. It's your recollection. You're the one to determine the fact, and you should not succumb to my inadvertent, perhaps, mischaracterizations of the evidence."

The defendant subsequently made an oral motion for a mistrial, arguing that (1) the court's initial characterization of the money as drug money prejudiced the jury by improperly reinforcing the state's theory that the money was in fact drug money and (2) the curative instructions were insufficient to overcome that claimed prejudice. The court denied the motion, to which the defendant then took exception.

The defendant claims that the court's own characterization of the money as "drug money" placed the prestige and influence of the court behind the state's theory of the case, thereby irreparably prejudicing the jury. We do not agree with the defendant that the court's initial characterization of the money as "drug money" irreparably prejudiced the jury. The curative instructions were sufficient to alleviate any prejudice that might have arisen in the absence of those instructions.

"The decision as to whether to grant a motion for a mistrial . . . is one that requires the trial court to exercise its judicial discretion. . . . Our review of the trial court's exercise of its discretion is limited to questions of whether the court correctly applied the law and could reasonably have concluded as it did. . . . Every reasonable presumption will be given in favor of the trial court's ruling. . . . It is only when an abuse of discre-

tion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion. . . .

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . The general rule in Connecticut is that a mistrial is granted only where it is apparent to the court that as a result of some occurrence during trial a party has been denied the opportunity for a fair trial. . . . The trial court enjoys wide discretion in deciding whether a mistrial is warranted . . . and its evaluation as to events occurring before the jury is to be accorded the highest deference. . . . Every reasonable presumption will be given in favor of the trial court's ruling . . . because the trial court, which has a firsthand impression of the jury, is in the best position to evaluate the critical question of whether the juror's or jurors' exposure has prejudiced a defendant. . . . It is only when an abuse of discretion is manifest or where an injustice appears to have been done that a reversal will result from the trial court's exercise of discretion. . . . A reviewing court gives great weight to curative instructions in assessing error." (Citations omitted; internal quotation marks omitted.) *State* v. *Relliford*, 63 Conn. App. 442, 447–48, 775 A.2d 351 (2001).

We acknowledge that "[a] defendant is entitled to a new trial if the judge's comments are improper and the defendant can demonstrate that prejudice resulted." *State* v. *Kirker*, 47 Conn. App. 612, 617, 707 A.2d 303, cert. denied, 244 Conn. 914, 713 A.2d 831 (1998). In the present case, however, we conclude that the curative instructions obviated any prejudice that, absent the instructions, might have arisen as a result of the court's improper characterization of the money as drug money. Prior to referring to the money as drug money, the court instructed the jurors that their recollection of

the evidence was controlling in determining the facts. Immediately after referring to the money as drug money, the court realized its mistake and instructed the jurors again that it was their recollection that was controlling and that they should disregard the court's inadvertent characterization of the money. During its second curative instruction, the court once more instructed the jurors to disregard as not "worth anything" its inadvertent characterization of the money and to determine the facts according to their recollection of the evidence. We therefore conclude that no injustice occurred and that the court did not abuse its discretion in denying the defendant's motion for a mistrial. See *State* v. *Relliford,* supra, 63 Conn. App. 448 (concluding that no injustice occurred and court did not abuse discretion in denying defendant's motion for mistrial where curative instruction given immediately after contentious statement was made and again in jury charge).

The judgment is affirmed.

In this opinion the other judges concurred.